# United States District Court

## *Northern District of Florida*

**UNITED STATES OF AMERICA** **CRIMINAL COMPLAINT**

**v.** **CASE NUMBER:** 1 07mj 31 AK

**ANGEL GARCIA**
**Defendant.**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On June 27, 2007, in the Northern District of Florida, the defendant, Angel Garcia,

did possess with intent to distribute in excess of one hundred (100) kilograms of a mixture and substance containing marijuana

in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B)(vii)

I further state that I am a Task Force Officer with the Drug Enforcement Administration and that this complaint is based upon the following facts:

***SEE ATTACHED AFFIDAVIT.***

Michael Lynch
Signature of Complainant

Sworn to before me and subscribed to in my presence, this 28th day of June 2007 in Gainesville, Florida.

Signature of Judicial Officer
Alan Kornblum
United States Magistrate Judge

U.S. DIST. CT.
07 JUN 28 PM 2:52
FILED

**AFFIDAVIT**

I, Michael H. Lynch, being duly sworn in a manner provided by law, do hereby depose and state the following:

1. I am a Detective with the Gainesville Police Department assigned as a Task Force Officer (TFO) with the United States Drug Enforcement Administration (DEA), I have been employed by the Gainesville Police Department for twenty five years and assigned to the DEA Task Force for ten months. I am presently assigned to the Gainesville, Florida Resident Office. My duties and responsibilities include investigating violations of 21 U.S.C. Section 841(a)(1), that is, possession, manufacturing and trafficking of illegal drugs, including marijuana.
2. This affidavit is based upon my personal knowledge, and the personal knowledge of other law enforcement officers as related to me.
3. On June 26, 2007, at approximately 1:00 PM, Gainesville Police Department (GPD) Cpl. B. Fundenburg was dispatched to Central Transport, 2636 NW 74 Place, Gainesville, Florida, regarding thirteen boxes on a pallet with at least one box that contained marijuana. The box was opened by the Central Transport manager, Ben Lalic, after he attempted to find better delivery information for the shipment. GPD Special Investigations Division Detective C. Ward and Lt. B. Knowles responded and later determined that approximately 800 pounds of marijuana had been delivered via the American Freight Company to Gainesville, Florida, and dropped off at Central Transport. The shipping manifest indicated the shipment was to be delivered to Natural Heat Systems, 216 SE 3rd Street, Gainesville, Florida, to a subject listed only

FILED
07 JUN 28 PM 2:53

as "Angel". Natural Heat Systems is not a business in Gainesville, FL, and the address does not exist.

4. On June 27, 2007 at approximately 10:10 AM, GPD Detective Ward was contacted by Ben Lalic, the manager of Central Transport, and advised that a subject, later identified as Angel GARCIA, had arrived to retrieve the boxes of marijuana. Lalic was directed to instruct GARCIA that the packages were out on a truck for delivery and to return later in the afternoon. A GPD team of Detectives arrived at Central Transport at approximately 10:20 AM and surveilled GARCIA from Central Transport to the Best Western Hotel, 4200 NW 97 Blvd, Gainesville Florida. GARCIA was driving a white Enterprise rental van. At approximately 2:05 PM GARCIA was followed from the Hotel back to Central Transport where he made contact with undercover Detective C. Ward who was posing as an employee. Detective Ward and other Detectives began loading the pallet of boxes containing the marijuana into GARCIA'S van, at which time another team of GPD Detectives moved in to affect an arrest. As the GPD Detectives approached GARCIA, he attempted to flee on foot but was immediately contacted.

5. I arrived at Central Transport after GARCIA was arrested. GARCIA was read his Miranda Rights, via a written Miranda card, by GPD Detective C. Ward as witnessed by Detective Hunter. GARCIA waived his rights and he agreed to answer questions without an attorney present. GPD Detective Ward and I then interviewed GARCIA briefly at Central Transport and later transported GARCIA to the Gainesville Resident Office (GRO) of DEA where Detective Hunter and I continued the interview.

6. During GARCIA'S post Miranda interview, he admitted that a Hispanic male known only to him as Mario and a female believed to be Mario's sister known to him as Karla or Maria hired him to pick up the shipment in Gainesville. GARCIA, who resides in Phoenix, Arizona, stated that Karla purchased him an airline ticket to fly from Phoenix to Gainesville on June 26, 2007. GARCIA arrived in Gainesville, took a shuttle to the Best Western Hotel where Enterprise Rentals delivered a panel van to him. GARCIA said that he was given driving directions to Central Transport to pick up the shipment by Karla via Nextel direct connect. GARCIA stated that Mario would also contact him via Nextel direct connect to discuss the details of the shipment pick-up. GARCIA advised he was going to be paid $800.00 to pick-up the shipment and was given $300.00 in advance. The remaining $500.00 was to be paid when GARCIA returned to Phoenix. GARCIA said that once he had the shipment loaded into the van he had been instructed to take the van back to the Best Western Hotel and leave it in the parking lot with the keys in the van. GARCIA said that other unknown subjects (later identified as Luis Antonio BUJANDA-CALLEJAS and Luis Alberto MATA-MORENO) had been in phone contact with him, and they were to be told when the van was at the hotel so they could take it. The phone number that BUJANDA-CALLEJAS and MATA-MORENO called GARCIA from is 813- 507-6705.

7. During the interview with GARCIA, TFO Lynch recorded numerous phone calls that were received by GARCIA from Mario, Karla, BUJANDA-CALLEJAS and MATA-MORENO. These phone calls were all in reference to the shipments pick-up at Central Transport and delivery back to the Best Western.

8. GARCIA continued his cooperation by placing a direct connect call to Karla and stating he had picked up the shipment and was on his way back to the Best Western Hotel. BUJANDA-CALLEJAS and MATA-MORENO made phone contact with GARCIA immediately after GARCIA called Karla, indicating Karla had been in contact with BUJANDA-CALLEJAS and MATA-MORENO. At my direction, GARCIA advised BUJANDA-CALLEJAS and MATA-MORENO that he was arriving at the Best Western at that time. Immediately after the GPD detectives left the van in the parking lot with the key in it, BUJANDA-CALLEJAS and MATA-MORENO arrived in a Mitsubishi SUV. BUJANDA-CALLEJAS and MATA-MORENO had been waiting in the parking lot for the van to arrive. MATA-MORENO exited the Mitsubishi and got into the driver seat of the Enterprise van. As BUJANDA-CALLEJAS began to drive away in the Mitsubishi, Detectives detained both subjects.

9. It was then learned that BUJANDA-CALLEJAS had in his possession a cellular phone, number 813- 507-6705. This is the phone that was being used to contact GARCIA in regards to the van's drop off at the hotel.

10. A previous shipment, weighing 800 pounds according to the Central Transport manifest, was sent June 4, 2007, from the Central Transport terminal drop off in Phoenix, AZ, for delivery to Natural Heat Systems, with a delivery address of 216 S.E. 3rd St., Gainesville, FL. As mentioned above, this address does not exist. This shipment was picked up at the Gainesville office of Central Transport by a Hispanic male who signed the manifest as Jose Luis Nogal on June 13, 2007.

11. Central Transport records also show that a 1200 pound shipment was sent from the Central Transport terminal drop off in Phoenix, AZ, on May 22, 2007, for delivery to Sunrise Heat Pumps with an address of 220 West Bryan St., Savannah, GA. A search of Savannah, GA, addresses does not show this as a valid address. A search of Savannah area businesses shows no record for Sunrise Heat Pumps. This shipment was not delivered, it was picked up at the Central Transport terminal in Savannah, GA, on May 31, 2007, by an individual who signed the manifest as Angel GARCIA.

12. On June 27, 2007, DEA TFO Conrad Hellwege and S/A Florentino Rosales interviewed Luis Alberto MATA-MORENO after MATA-MORENO was read his rights by S/A Rosales. MATA-MORENO stated that he did not speak any English so the interview was conducted by S/A Rosales who is a native Mexican and who is fluent in Spanish and in English. MATA-MORENO waived his rights via a written rights waiver form (written in Spanish) and he agreed to answer questions without an attorney present. S/A Rosales translated TFO Hellwege's questions for MATA-MORENO and he translated MATA-MORENO answers for TFO Hellwege.

13. MATA-MORENO told the investigators that he came to Gainesville from Nogales, Mexico, after having left Mexico four days ago. He said he drove here with a Mexican male who he knew as Martin LOPEZ. MATA-MORENO said he met LOPEZ at a party in Nogales approximately one month ago. LOPEZ told MATA-MORENO that he could get a job for him in Florida with a furniture delivery company. MATA-MORENO said he was planning on working at the company for 30 days. TFO Hellwege asked MATA-MORENO where his luggage was and MATA-MORENO stated that he got in to an argument with LOPEZ when LOPEZ dropped

him off at a convenience store somewhere in Gainesville. LOPEZ then left him there and he was picked up by Luis Antonio BUJANDA-CALLEJAS. MATA-MORENO stated that he had never met BUJANDA-CALLEJAS before.

14. TFO Hellwege asked MATA-MORENO how much luggage he brought with him from Mexico. MATA-MORENO stated he brought two days worth of clothes. MATA-MORENO stated he would buy more clothes as needed. TFO Hellwege asked MATA-MORENO what the name of the hotel/motel was that he and LOPEZ stayed in last night. MATA-MORENO did not know the name and he could not recall the name of any motel where they stayed during their four day trip to Gainesville. MATA-MORENO was asked five times how much contact he had with LOPEZ in Nogales before coming to Gainesville with him. Each time MATA-MORENO would change the subject. MATA-MORENO finally stated he only had sporadic phone contact with LOPEZ prior to agreeing to go with him to Florida.

15. MATA-MORENO stated that after BUJANDA-CALLEJAS picked him up, BUJANDA told him he (MATA-MORENO was supposed to drive the van (that contained the marijuana) to a mall in Gainesville and deliver it to a white male that worked for the furniture company. MATA-MORENO did not know the name of the furniture company. MATA-MORENO also stated that he did not know there was marijuana in the van.

16. TFO Hellwege asked MATA-MORENO what route he and LOPEZ took to get from Nogales, Mexico to Gainesville, FL. MATA-MORENO said he did not know. TFO Hellwege asked MATA-MORENO if he would take a lie detector test concerning the truthfulness of his answers and MATA-MORENO stated that he would not.

17. Angel GARCIA, Luis Antonio BUJANDA-CALLEJAS and Luis Alberto MATA-MORENO were transported to the Alachua County Jail pending their initial appearance in federal court.

18. Based on the foregoing, I believe there is probable cause to believe that Angel GARCIA, Luis Antonio BUJANDA-CALLEJAS and Luis Alberto MATA-MORENO have committed violations of 21 U.S.C. Section 841(b)(1)(B) in that they knowingly possessed with intent to distribute marijuana, in Alachua County within the Northern District of Florida.

MICHAEL H. LYNCH
TASK FORCE AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn and subscribed to before me this 28th day of June, 2007 AK by Task Force Agent Michael H. Lynch.

ALAN KORNBLUM
UNITED STATES MAGISTRATE JUDGE